IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-161

No. 374PA19

Filed 17 December 2021

NORTH CAROLINA FARM BUREAU MUTUAL INSURANCE COMPANY, INC.

v.

WILLIAM THOMAS DANA, JR., INDIVIDUALLY and as ADMINISTRATOR OF THE ESTATE OF PAMELA MARGUERITE DANA

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 267 N.C. App. 42 (2019), affirming an order entered on 2 August 2018 by Judge Eric C. Morgan in Superior Court, Forsyth County. Heard in the Supreme Court on 19 May 2021.

*William F. Lipscomb for plaintiff-appellant.*

*C. Douglas Maynard, Jr., for defendant-appellee.*

*Bailey & Dixon, L.L.P., by J.T. Crook, Philip A. Collins, and David S. Coats, for North Carolina Association of Defense Attorneys, amicus curiae.*

ERVIN, Justice.

¶ 1      The issue before us in this case involves the amount of underinsured motorist coverage that should be distributed to defendant William Thomas Dana, Jr., individually and as administrator of the estate of Pamela Marguerite Dana, from the policy of automobile liability insurance that Ms. Dana had purchased from plaintiff North Carolina Farm Bureau Mutual Insurance Company, Inc., for the purpose of

compensating them for the injuries that they sustained in an accident that resulted from the negligence of Matthew Bronson. After careful consideration of the record in light of the applicable law, we conclude that the Court of Appeals erred by affirming an order entered by the trial court granting summary judgment in favor of the Danas and against Farm Bureau on 2 August 2018 in reliance upon its prior decision in *N.C. Farm Bureau Mut. Ins. Co., Inc. v. Gurley*, 139 N.C. App. 178 (2000); that its decision in favor of the Danas should be reversed; and that this case should be remanded to the Court of Appeals for further remand to Superior Court, Forsyth County, for the entry of a judgment consistent with the principles enunciated in this opinion.

¶ 2    On 3 February 2016, Mr. Bronson, who was intoxicated, was driving in a southbound direction on Old Salisbury Road in Winston-Salem when the vehicle that he was operating entered the northbound lane and collided with a vehicle owned by Ms. Dana, resulting in serious injuries to Ms. Dana and Mr. Dana, who was a passenger in Ms. Dana's vehicle. The injuries that Ms. Dana sustained ultimately proved fatal. Jessica Jones, a passenger in Mr. Bronson's vehicle, was also killed in the accident. A vehicle owned and operated by Joshua Ryan Jeffries was damaged in the accident as well.

¶ 3    At the time of the accident, Mr. Bronson's vehicle was covered by a policy of automobile insurance that had been issued by Integon National Insurance Company which provided bodily injury liability coverage with limits of up to $50,000 per person

and $100,000 per accident. Subject to approval by the Superior Court, Integon proposed to apportion the full amount of the available per accident coverage as follows:

| | |
|---|---|
| William Dana | $32,000 |
| Estate of Pamela Dana | $43,750 |
| Estate of Jessica Jones | $23,500 |
| Joshua Jeffries | $750 |
| Total | $100,000 |

¶ 4  At the time of the accident, Ms. Dana was insured under a policy of automobile liability insurance issued by Farm Bureau that included underinsured motorist coverage with limits of $100,000 per person and $300,000 per accident. In response to a claim submitted by Ms. Dana's estate, Farm Bureau offered to pay the full per-person limit to both Mr. Dana and the Estate, less the amount that had been received from Integon's liability coverage, resulting in the following distribution:

| | |
|---|---|
| William Dana | $100,000 per-person underinsured limit |
| | -$32,000 Integon coverage |
| | $68,000 total underinsured payment |
| Estate of Pamela Dana | $100,000 per-person underinsured limit |
| | -$43,750 Integon coverage |
| | $56,250 total underinsured payment |

¶ 5        In response, Mr. Dana argued that he and the Estate were entitled to the full amount of per-accident underinsured motorist coverage set out in the policy, less the amount of liability coverage that had been provided by Integon and the amount that had already been offered by Farm Bureau. As a result, Farm Bureau would be obligated to pay a total of $124,250 to the Danas under its own proposal, while it would be obligated to provide a total of $200,000 in underinsured motorist coverage to the Danas under the proposal that they submitted, which consisted of the $300,000 per-accident limit provided under the Farm Bureau policy less the $100,000 in liability coverage provided by Integon. As a result, the Danas claimed to be entitled to an additional $75,750 in underinsured motorist coverage over and above the amount that Farm Bureau had already tendered to them.

¶ 6        On 7 August 2017, Farm Bureau filed a complaint seeking a declaratory judgment concerning the amount of underinsured motorist coverage that it was required to provide to the Danas. After both parties filed competing motions for summary judgment, the trial court entered an order granting summary judgment in favor of the Danas on 2 August 2018. Farm Bureau noted an appeal from the trial court's order to the Court of Appeals.

¶ 7        In affirming the trial court's order, the Court of Appeals began by noting that it had, in *Gurley*, "established a straightforward analysis to determine in what amount, if any, [underinsured motorist] coverage is available, given both the

insurance policy in question and our [underinsured motorist] statute." *N.C. Farm Bureau Mut. Ins. Co.*, 42, 44 (2019) (citing *Gurley*, 139 N.C. App. at 180). The Court of Appeals noted that, in "decid[ing] how much coverage the insured party or parties are entitled to, we must consider '(1) the number of claimants seeking coverage under the [underinsured motorist] policy; and (2) whether the negligent driver's liability policy was exhausted pursuant to a per-person or per-accident cap.' " *Id.* (quoting *Gurley*, 139 N.C. App. at 181). More specifically, the Court of Appeals noted that it had held in *Gurley* that

> [W]hen more than one claimant is seeking [underinsured motorist] coverage, as is the case here, how the liability policy was exhausted will determine the applicable [underinsured motorist] limit. In particular, when the negligent driver's liability policy was exhausted pursuant to the per-person cap, the [underinsured motorist] policy's per-person cap will be the applicable limit. However, when the liability policy was exhausted pursuant to the per-accident cap, the applicable [underinsured motorist] limit will be the [underinsured motorist] policy's per-accident cap.

*Id.* (quoting *Gurley*, 139 N.C. App. at 181). In view of the fact that the parties had stipulated that the Danas were entitled to collect some amount of underinsured motorist coverage and the fact that "the negligent driver's liability coverage was exhausted pursuant to the per-accident cap," the Court of Appeals held that "*Gurley* mandates [that] the [Danas] are collectively entitled to receive coverage pursuant to the per-accident cap of $300,000." *Id.* As a result, the Court of Appeals affirmed the

trial court's order. This Court granted Farm Bureau's petition for discretionary review of the Court of Appeals' decision.

¶ 8        Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2019).

> Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue of material fact and that any party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial judge must view the presented evidence in the light most favorable to the nonmoving party. If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmovant to present specific facts which establish the presence of a genuine factual dispute for trial. Nevertheless, if there is any question as to the weight of evidence summary judgment should be denied.

*In re Will of Jones*, 362 N.C. 569, 573–74 (2008) (cleaned up). In light of the parties' agreement that the present record does not reveal the existence of any material issue of disputed fact, the only issue that remains for our resolution in this case is whether one party or the other is entitled to the entry of judgment in its favor as a matter of law.

¶ 9        The North Carolina Motor Vehicle Safety and Financial Responsibility Act was enacted to ensure that every motor vehicle operator in North Carolina has "proof of

ability to be able to respond in damages for liability [ ] on account of accidents . . . arising out of the ownership, maintenance or use of a motor vehicle." N.C.G.S. § 20-279.1(11) (2019). For that reason, the Financial Responsibility Act prohibits the registration of any vehicle in North Carolina unless the owner maintains "proof of financial responsibility" in the form of a policy of liability insurance, with such policies being required to conform to the requirements of N.C.G.S. § 20-309(b) and to enable the owner to pay damages in the amount of $30,000 "because of bodily injury to or death of one person in any one accident, and, subject to said limit for one person, in the amount of" $60,000 "because of bodily injury to or death of two or more persons in any one accident." N.C.G.S. § 20-279.1(11). The Financial Responsibility Act's requirement that "each automobile owner [must] carry a minimum amount of liability insurance providing coverage for the named insured as well as any other person using the automobile with the express or implied permission of the named insured" is written into every policy of automobile insurance that is subject to the Financial Responsibility Act as a matter of law. *Integon Indem. Corp. v. Universal Underwriters Ins. Co.,* 342 N.C. 166, 167 (1995) (citing N.C.G.S. § 20-279.21(b)(2)). *Nationwide Mut. Ins. Co. v. Chantos*, 293 N.C. 431, 441 (1977).

¶ 10     According to N.C.G.S. § 20-279.21(b)(2), a policy of automobile liability insurance must protect the named insured or a permissive user

> against loss from the liability imposed by law for damages
> arising out of the ownership, maintenance or use of such

> motor vehicle or motor vehicles with the [United States] . . . subject to limits exclusive of interest and costs, with respect to each motor vehicle as follows: [$30,000] because of bodily injury to or death of one person in any one accident and, subject to said limit for one person, [$60,000] because of bodily injury or death to two or more persons in any one accident, and [$25,000] because of injury to or destruction of property of others in any one accident.

Although the manner in which the limitation of liability provisions of N.C.G.S. § 20-279.21(b)(2) is intended to operate is relatively clear, this case involves underinsured motorist, rather than liability, coverage.

¶ 11 The underinsured motorist coverage that is made available pursuant to N.C.G.S. § 20-279.21(b)(4) applies "when, by reason of payment of judgment or settlement, all liability bonds or insurance policies providing coverage for bodily injury caused by the ownership, maintenance, or use of the underinsured vehicle have been exhausted." N.C.G.S. § 20-279.21(b)(4); *see also Lunsford v. Mills*, 367 N.C. 618, 626 (2014) (stating that N.C.G.S. § 20-279.21 "was passed to address circumstances where the tortfeasor has insurance, but his coverage is in an amount insufficient to compensate the injured party for his full damages") (cleaned up). In order to determine whether an injured party's underinsured motorist coverage applies in accordance with the Financial Responsibility Act, a reviewing court must begin by ascertaining whether the tortfeasor's vehicle was an "uninsured highway vehicle" and whether the tortfeasor's liability policy has been exhausted. N.C.G.S. § 20-279.21(b)(4). In this case, the parties agree that Mr. Bronson's vehicle is an

"underinsured highway vehicle" given that the sum of his limits of liability, which consisted of coverage in a per-person amount of $50,000 and a per-accident amount of $100,000, was less than the limits of underinsured motorist coverage applicable to Ms. Dana's vehicle, which consisted of per-person coverage of $100,000 and per-accident coverage of $300,000, and that Mr. Bronson's liability was exhausted by Integon's proposed distribution of the $100,000 in per-accident coverage among the various claimants. Thus, since the underinsured motorist coverage available with respect to Ms. Dana's vehicle applies, the next step in the required analysis is to calculate the amount of coverage that is available to the Danas under the Farm Bureau policy.

¶ 12    As we have already noted, the statutory provisions governing underinsured motorist coverage are contained in N.C.G.S. § 20-279.21(b)(4) which is, to say the absolute least, a lengthy and complicated statutory subsection that contains a considerable amount of language that seems to bear upon the proper resolution of the issue that is before us in this case. Among other things, N.C.G.S. § 20-279.21(b)(4) provides that "[t]he limits of such underinsured motorist bodily injury coverage shall be equal to the highest limits of bodily injury coverage for any one vehicle insured under the policy," subject to certain maximum limitations that are not relevant in this instance. In addition, N.C.G.S. § 20-279.21(b)(4) provides that "the limits [of underinsured motorist coverage] shall be equal to the limits of uninsured motorist

bodily injury coverage"; that an "underinsured highway vehicle" is one in which "the sum of the limits of liability under all" applicable coverage "is less than the applicable limits of underinsured motorist coverage for the vehicle involved in the accident" or "the total amount actually paid to that person . . . is less than the applicable limits of underinsured motorists coverage for the vehicle involved in the accident"; and that a "highway vehicle" is not an "underinsured motor vehicle . . . unless the owner's policy insuring that vehicle provides underinsured motorist coverage with limits that are greater than that policy's bodily injury liability limits." Furthermore, N.C.G.S. § 20-279.21(b)(4) provides that exhaustion of the available liability coverage occurs when either "the limits of liability per claim have been paid upon the claim" or, "by reason of multiple claims, the aggregate per occurrence limit of liability has been paid."

¶ 13      In addition to these references to the issue of the limitation of liability contained in those portions of the relevant statutory provision defining when a vehicle is an "uninsured highway vehicle," N.C.G.S. § 20-279.21(b)(4) states that "the limit of underinsured motorist coverage applicable to any claim is determined to be the difference between the amount paid to the claimant under the exhausted liability policy or policies and the limit of underinsured motorist coverage applicable to the motor vehicle involved in the accident" and that, in the event that the "claimant is an insured under the underinsured motorist coverage on separate or additional policies, the limit of underinsured motorist coverage applicable to the claimant is the

difference between the amount paid to the claimant under the exhausted liability policy or policies and the total limits of the claimant's underinsured motorist coverages as determined by combining the highest limit available under each policy," with "[t]he underinsured motorist limits applicable to any one motor vehicle under a policy [to not] be combined with or added to the limits applicable to any other motor vehicle under that policy."

¶ 14        The repeated references to the issue of the limitation of liability contained in N.C.G.S. § 202-79.21(b)(4) prevent us from concluding that the relevant statutory language does not speak to the issue that is before us in this case. In light of the fact that the expressions "limit of liability" and "limits of liability" appear repeatedly in N.C.G.S. § 20-279.21(b)(4), it is difficult for us to conclude that these expressions have no meaning, a result that, if adopted by the Court, would allow insurers to have a significant degree of flexibility in drafting policies as they see fit.[1] Such an outcome is inconsistent with the consumer protection considerations that motivated the enactment of N.C.G.S. § 20-279.21. As a result, since the relevant statutory language is not silent, the determinative issue for purposes of this case is how the statutory

---

[1] Although numerous other statutory provisions that grant significant regulatory authority to the Commissioner of Insurance, none of them govern the manner in which the amount of underinsured motorist coverage is to be disbursed, a fact that reduces the likelihood that the General Assembly intended to remain silent with respect to the issue that is before us in this case.

references to the limitation of liability found in N.C.G.S. § 20-279.21(b)(4) should be construed.

¶ 15 As we have already suggested, the specific statutory language concerning the limitation of liability contained in N.C.G.S. § 20-279.21(b)(2), which clearly contemplates both a per-person and a per-accident limit of liability and makes the per-accident limit subject to the per-person limit, is not directly incorporated into the relevant provisions of N.C.G.S. § 20-279.21(b)(4). On the other hand, N.C.G.S. § 20-279.21(b)(4) clearly refers to both a "limit" and "limits" of liability. Although the absence of a direct incorporation of the concept of per-person and per-accident limits of liability as set out in N.C.G.S. § 20-279.21(b)(2) into the relevant portions of N.C.G.S. § 20-279.21(b)(4) and the use of both singular and plural language in N.C.G.S. § 20-279.21(b)(4) prevents us from concluding that the relevant statutory language is clear and unambiguous, such a determination is only the first step that must be taken in order to resolve the specific issue that is before us in this case.

¶ 16 "Legislative intent controls the meaning of a statute." *Brown v. Flowe*, 349 N.C. 520, 522 (1998) (quoting *Shelton v. Morehead Mem'l Hosp.,* 318 N.C. 76, 81 (1986)).

> The intent of the General Assembly may be found first from the plain language of the statute, then from legislative history, "the spirit of the act and what the act seeks to accomplish." If the language of the statute is clear, the court must implement the statute according to the plain meaning of its terms so long as it is reasonable to do so."

*Lenox, Inc. v. Tolson,* 353 N.C. 659, 664 (2001) (citation omitted) (quoting *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297 (1998)). Courts should give effect to the words actually used in a statute and should neither delete words that are used nor insert words that are not used into the relevant statutory language during the statutory construction process. *Lunsford v. Mills*, 367 N.C. 618, 623 (2014). "[U]ndefined words are accorded their plain meaning so long as it is reasonable to do so." *Polaroid v. Offerman*, 349 N.C. 290, 297 (1998), *abrogated on other grounds by Lenox, Inc. v. Tolson,* 353 N.C. 659 (2001). Finally, statutes should be construed so that the resulting construction "harmonizes with the underlying reason and purpose of the statute." *Electric Supply Co. v. Swain Elec. Co.*, 328 N.C. 651, 656 (1991). "The purpose of this State's compulsory motor vehicle insurance laws, of which the underinsured motorist provisions are a part, was and is the protection of innocent victims who may be injured by financially irresponsible motorists," *Proctor v. N.C. Farm Bureau Mut. Ins. Co.,* 324 N.C. 221, 224 (1989), so that, in the event that the statutory language in which the Financial Responsibility Act is couched is ambiguous, the statute "will be liberally construed so that the [statute's] beneficial purpose is accomplished." *Moore v. Hartford Fire Ins. Co. Grp.,* 270 N.C. 532, 535 (1967).

¶ 17        The terms "limit of liability" and "limits of liability," while not statutorily defined, do have well-understood meanings in insurance-related contexts, with there

being no reason that we can see for departing from those well-recognized meanings in this case. In addition, we are not persuaded, in light of the complexity of the language in which N.C.G.S. § 20-279.21(b)(4) is couched, that too much emphasis should be placed upon the General Assembly's use of the singular, rather than the plural, in attempting to construe the relevant statutory language. Our construction of the relevant provisions of N.C.G.S. § 20-279.21(b)(4) will be undertaken in light of these two fundamental premises.

¶ 18      A careful reading of the relevant portions of N.C.G.S. § 20-279.21(b)(4) satisfies us that the references to "limit," stated in the singular, occur in instances in which the General Assembly is referring to a single limit rather than to a collection of limits, such as the per-person and per-accident limits of liability that appear to be standard in most automobile liability insurance policies. Although one could argue that this language means that there is one, and only one, limit of liability that should be deemed applicable to any particular claim for all purposes, it seems to us that the relevant expression is equally, if not more, consistent with an interpretation of the relevant statutory language that assumes that the relevant limit of liability has already been determined on the basis of other considerations rather than as compelling the conclusion that any particular limit of liability should be deemed controlling for all relevant purposes. As a result, an examination of the literal statutory language suggests to us that the relevant provisions in N.C.G.S. § 20-

279.21(b)(4) tend to incorporate, at least by implication, the traditional use of both per-person and per-accident liability limits that insurers, policyholders, and policy makers are all familiar with and that are explicitly stated in N.C.G.S. § 20-279.21(b)(2) rather than requiring the use of a "one size fits all" rule focusing upon a single limit that is applicable in all situations.

¶ 19      In addition, the references to both per-person and per-accident liability limits in the underinsured motorist context does not seem to us to be foreclosed by the relevant statutory language. The use of the singular "limit" in the sentence with which the second paragraph of N.C.G.S. § 20-279.21(b)(4) begins strikes us as a pretty slender reed upon which to base a conclusion that the per-person and per-accident limits of liability may not both be applicable in determining the amount to be paid to any particular claimant (as compared to determining whether a particular vehicle is an "underinsured highway vehicle" or as to whether the amounts paid to all claimants, considered in their entirety, are subject to the per-person or the per-accident limit). We are unable to discern any reason why the General Assembly would have intended to preclude the use of both per-person and per-accident liability limitations in determining the maximum amount of underinsured motorist coverage that is available for payment to any individual claimant and believe that the most reasonable reading of the relevant statutory language provides for a common sense resolution of the dispute that is before us in this case, which is that, in cases involving

multiple claimants, the total amount of underinsured motorist coverage available to those claimants (considering both the available liability coverage and the available underinsured motorist coverage) is limited by the per-accident limit and that the total amount of coverage available to any individual claimant is constrained by the per-person limit.

¶ 20        Although the purpose of N.C.G.S.§ 20-279.21 is, of course, to provide protection for innocent victims of motor vehicle negligence, that fact does not inevitably require that one interpret the relevant statutory language to produce the maximum possible recovery for persons injured as a result of motor vehicle negligence regardless of any other consideration. Instead, the usual rules of statutory construction govern the interpretation of N.C.G.S. § 20-279.21(b)(4), subject to the caveat that the relevant statutory language should be construed to produce the greatest possible protection for the innocent victims of negligent conduct permitted by a reasonable interpretation of the relevant statutory language. In the absence of something in the relevant statutory language that otherwise compels such a result, we are unable to conclude that the General Assembly intended N.C.G.S. § 20-279.21(b)(4) to be applied in a manner that fails to take into account the existence of multiple limits of liability and places an injured party in a more favorable position than he or she would have occupied had the tortfeasor been fully insured. In light of the fact that the relevant statutory language can be construed in such a manner as to avoid such a result, this

case is appropriately resolved in such a manner as to make the total amount of underinsured coverage payments received by the claimants subject to per-accident limit of liability while limiting the amount received by any individual claimant by the per-person liability limit.

In reaching this conclusion, we do not believe that we are limited, in construing N.C.G.S. § 20-279.21(b)(4), to the options of making the per-person limit controlling for all purposes, to make the per-accident limit controlling for all purposes, to adopt the *Gurley* rule, or to treat the relevant statutory language as silent. Although a number of analytical approaches could conceivably be available to resolve the problem that this case presents for our consideration, it does not seem to us that treating the relevant statutory provision as silent can be squared with the numerous references to limits of liability that appear in N.C.G.S. § 20-279.21(b)(4), which must, as we have already noted, be construed as meaning something.[2] In addition, we see no reason for concluding that the question that is before us in this case must be resolved by using either the per-person or per-accident limits to the exclusion of the other in light of either the relevant statutory language or the traditional understanding of the manner in which issues relating to limits of liability should be

---

[2] Admittedly, N.C.G.S. § 20-279.21(b)(4) does not directly and explicitly address the issue that is before us in this case. However, a statutory provision does not have to explicitly and directly address a particular issue in order for it to have a particular meaning. *In re Ernst & Young, LLP*, 363 N.C. 612, 616 (2009) (stating that, even if "the statute is ambiguous or unclear, we must interpret the statute to give effect to the legislative intent").

resolved. Instead, a hybrid approach of the type that we have set out above seems to us to be most reflective of likely legislative and shareholder expectations as to the amount of coverage that should be available to any particular claimant.

¶ 22 Admittedly, the decision of the Court of Appeals in *Gurley*, upon which the Court of Appeals and the Danas have relied in this case, has been on the books for almost two decades without having been disturbed by the General Assembly. In ordinary circumstances, we would be inclined to give the General Assembly's acquiescence in that decision near-controlling effect. However, we cannot agree that the canon of legislative acquiescence, *Young v. Woodell*, 343 N.C. 459, 462–63 (1996) (stating that "[t]he failure of the legislature to amend a statute which has been interpreted by a court is some evidence that the legislature approves of the court's interpretation), should be deemed controlling in this instance given that the Court of Appeals described the rule that it adopted in *Gurley* as having the effect of avoiding an "interpret[ation] of the statute that . . . would result in defendants receiving more compensation than if [the tortfeasor] had been either fully insured or uninsured altogether." *Gurley,* 139 N.C. App. at 182. In view of the fact that applying the rule adopted in *Gurley* to the facts in this case would have exactly the effect that the rule in question was explicitly intended to avoid, it is difficult for us to afford any weight in the interpretive process to the General Assembly's failure to modify the relevant provisions of N.C.G.S. § 20-279.21(b)(4) to account for the likelihood that *Gurley*

would be applied in a mechanical manner to produce a result that *Gurley* itself appears to have been intended to avoid.

¶ 23    Thus, for all of these reasons, we conclude that the Court of Appeals' decision in this case should be reversed. Although the principle enunciated in *Gurley* may well produce results that cohere with the likely legislative intent in many instances, the facts of this case demonstrate that its application can, in some instances, result in the payment of an amount that exceeds the per-person limit in cases involving multiple claimants. However, the relevant statutory language most readily supports the use of an approach that determines the amount to be paid to any particular claimant by treating the per-accident amount of underinsured motorist coverage as the total sum that is available to all of the claimants entitled to a share of the available underinsured motorist coverage, subject to the caveat that the amount of underinsured motorist coverage that is available to any individual claimant is limited to the per-person amount. As a result, the decision of the Court of Appeals is reversed and this case is remanded to Superior Court, Forsyth County, for the entry of a judgment declaring that the total amount of underinsured coverage made available to the Danas collectively is to be set at the per-accident limit, with no individual claimant to receive more than the per-person limit.

REVERSED AND REMANDED.

Justice EARLS concurring.

I join fully in the majority's well-reasoned examination of N.C.G.S. § 20-279.21(b)(4) and in the conclusion that the provision incorporates "the traditional use of both per person and per accident liability limits that insurers, policyholders, and policy makers are all familiar with and that are explicitly stated in N.C.G.S. § 20-279.21(b)(2) rather than requiring the use of a particular limit of liability in any particular case." Further, I agree with the majority that although the FRA must be construed in light of the General Assembly's clear intent to protect innocent victims of automobile accidents from financial ruin, we must determine the meaning of N.C.G.S. § 20-279.21(b)(4) by applying our longstanding principles of statutory interpretation. Application of these principles in this case requires us to reverse the decision below. I write separately only to provide further explanation as to why I believe the effect of this Court's decision is to overrule a settled precedent of the Court of Appeals, *N.C. Farm Bureau Mut. Ins. Co. v. Gurley*, 139 N.C. App. 178 (2000), and why I believe doing so is justified, notwithstanding the parties' potential reliance interests which are implicated in departing from the rule endorsed in that case.

The rule as stated in *Gurley* was that when an insured seeks UIM benefits from his or her insurer after an accident caused by a negligent driver, the insured's UIM benefits will be paid out up to the limit utilized by the negligent driver's primary liability insurer. If the negligent driver's primary liability insurer pays out on a per-

person basis, the insured's UIM provider pays out on a per-person basis; if the negligent driver's primary liability insurer pays out on a per-accident basis, the insured's UIM provider pays out on a per-accident basis. *Gurley*, 139 N.C. App. at 181. Thus, if the *Gurley* rule were applied in this case, the Danas would be entitled to collect up to the per-accident limit provided under their UIM policy, because Mr. Bronson's insurer paid out on a per-accident basis. As a result, the Danas would receive payments in excess of the per-person limit contained in their own UIM policy.

As the majority correctly notes, this result plainly contravenes the purpose of the *Gurley* rule, which was crafted to avoid "giv[ing] defendants a windfall simply because they were involved in an accident with an underinsured motorist, as opposed to an insured or uninsured motorist." 139 N.C. App. at 182–83. The approach the majority adopts instead subjects the Dana's UIM claim to the per person coverage limit contained in their UIM policy, whether or not Mr. Bronson's primary liability insurer pays out by applying the per-person or per-accident limit. Thus, even though it may be correct that "the principle enunciated in *Gurley* may well produce results that cohere with the likely legislative intent in many instances," we should not hide from the fact that the legal rule *Gurley* announced has been supplanted.

Of course, this Court "is not bound by precedents established by the Court of Appeals." *N. Nat. Life Ins. Co. v. Lacy J. Miller Mach. Co., Inc.*, 311 N.C. 62, 76 (1984). Regardless of what the Court of Appeals held in *Gurley*, *Gurley* does not control our

disposition of the appeal presently before us. Our role when reviewing a matter "after a determination by the Court of Appeals . . . is to determine whether there is error of law[.]" N.C. R. App. P. 16. When tasked with discerning the meaning of a North Carolina statute, even one which has previously been interpreted by the Court of Appeals, we approach the task with fresh eyes, adopting the reasoning deployed and outcome reached by our colleagues below only to the extent we find their reasoning persuasive and their outcome correct.

Nevertheless, this Court should explain why we are overruling a lower court decision, rather than simply invoking our authority to do so. Although "[o]nly this Court may authoritatively construe the Constitution and laws of North Carolina with finality," *Lea Co. v. N.C. Bd. of Transp.*, 308 N.C. 603, 610 (1983), most legal questions are ably resolved in the first instance by the Court of Appeals. In many areas of the law, and given the way cases come to this Court, it may be a long time before this Court has cause to weigh in on the precise issue addressed in a decision below. During this intervening period after the Court of Appeals has decided an issue but before this Court has taken it up, the Court of Appeals' interpretation of a state law controls, and parties reasonably order their affairs in accordance with the Court of Appeals' disposition of the issue.

In my view, such circumstances are present in this case. More than twenty years ago, the Court of Appeals was confronted with the question now before us and

concluded that "the applicable UIM limit under [N.C.G.S.] § 20–279.21(b)(4) will depend on two factors: (1) the number of claimants seeking coverage under the UIM policy; and (2) whether the negligent driver's liability policy was exhausted pursuant to a per-person or per-accident cap." *Gurley*, 139 N.C. App. at 181. For the reasons incisively described by the majority, I believe the legal rule *Gurley* articulated is inconsistent with the applicable statutes and should be overruled. Still, I am cognizant of the potential unfairness which arises when we disturb an interpretation of a statutory provision that has governed for two decades, especially when the statutory provision being interpreted is, by law, necessarily incorporated into every contract for automobile insurance executed in this state. *N.C. Farm Bureau Mut. Ins. Co., Inc. v. Lunsford*, 378 N.C. 181, 2021-NCSC-83, ¶ 19 ("[A]ll automobile accident insurance policies executed in North Carolina necessarily incorporate North Carolina's FRA.").

¶ 30 "[L]aws which subsist at the time and place of the making of a contract . . . enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *N.C. Ass'n of Educators, Inc. v. State*, 368 N.C. 777, 789 (2016). This includes interpretations of statutory provisions pronounced by the Court of Appeals which are not inconsistent with any decision of this Court. *Cf., Lynch v. Universal Life Church*, 775 F.2d 576, 580 (4th Cir. 1985) ("The North Carolina Court of Appeals is a court of statewide jurisdiction, and its decisions are binding on state trial courts

in the absence of a conflicting decision by the North Carolina Supreme Court."). When Farm Bureau and Ms. Dana entered into a contract for automobile insurance, the terms of their contract necessarily incorporated N.C.G.S. § 20-279.21(b)(4), which until today meant what the Court of Appeals said it meant in *Gurley*.

¶ 31       These reliance interests alone do not displace our "duty . . . to declare what the law is." *S. Ry. Co. v. Cherokee Cty.*, 177 N.C. 86, 88 (1919). But I do believe that these reliance interests justify us treating the Court of Appeals' decision, and the rationale behind it, as weighty. When tasked with examining a decision of the Court of Appeals interpreting a North Carolina statutory provision which was decided a substantial period of time in the past and which is not in tension with any decision of this Court interpreting the same provision, I would accord that decision something akin to the respect we accord a prior precedent of this Court under the doctrine of stare decisis.

¶ 32       Under the doctrine of stare decisis, we adhere to prior decisions of this Court "both out of respect for the opinions of our predecessors and because it promotes stability in the law and uniformity in its application." *Wiles v. Construction Co.*, 295 N.C. 81, 85 (1978). When considering whether or not to depart from prior precedent, I reiterate my view that we should start with the factors articulated by the United States Supreme Court, which include "the quality of [ ] reasoning [of the precedent being challenged], the workability of the rule it established, its consistency with other related decisions, developments since the decision was handed down, and reliance on

the decision." *State v. Hilton*, 378 N.C. 692, 2021-NCSC-115, ¶ 78 (Earls, J., dissenting) (alterations in the original) (quoting *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2478–79 (2018)).

¶ 33        Applying these factors to the present case, I would conclude that, notwithstanding any potential reliance interests, the rule articulated in *Gurley* should be displaced. I agree with the majority that the parties would have had cause to doubt that *Gurley* could sustain the outcome which resulted in the proceedings below, given the clear intent animating the Court of Appeals' decision in that case. Regardless, whatever reliance interests may have existed are outweighed by the unmistakable fact that the *Gurley* rule is irreconcilable with the text, structure, and purpose of the FRA generally and N.C.G.S. § 20-279.21(b)(4) specifically, as the majority has persuasively explained. Therefore, I agree with the majority that the Court of Appeals' decision in this case should be reversed. As a consequence, the interpretation of N.C.G.S. § 20-279.21(b)(4) offered in *Gurley* is no longer governing law and is no longer incorporated into automobile insurance contracts executed in this state.

Justice BERGER concurring.

On appeal to this Court, Farm Bureau argues that the Court of Appeals erred when it affirmed the trial court's determination that Mr. Dana and the Estate must be paid pursuant to the per accident limit in the parties' UIM agreement. I agree with the majority that the trial court erred when it granted summary judgment in favor of Mr. Dana and the Estate, and the Court of Appeals erred when it affirmed the trial court's decision.

I disagree with the majority about the reason why the claims in this case are governed by the per person limitations. The majority concedes that the North Carolina Motor Vehicle Safety and Financial Responsibility Act (FRA) only "seems" to apply here. In my opinion, the FRA does not address the particular question at issue in this case. Because the issue here is not addressed by the FRA, but is specifically addressed by terms of the insurance policy at issue, the terms of the policy must control. Therefore, I concur only in the result reached by the majority.

The FRA was enacted to ensure that every motor vehicle in the State has "proof of ability to respond in damages for liability[ ] on account of accidents . . . arising out of the ownership, maintenance or use of a motor vehicle[.]" N.C.G.S. § 20-279.1(11) (2019). The FRA prohibits the registration of any automobile in North Carolina unless the owner maintains "proof of financial responsibility" in the form of a liability insurance policy. Policies must conform with the requirements of N.C.G.S. § 20-

309(b), and demonstrate the owner's ability to pay damages in the amount of

> ($30,000) because of bodily injury to or death of one person in any one accident, and, *subject to said limit for one person*, in the amount of . . . ($60,000) because of bodily injury to or death of two or more persons in any one accident[.]

N.C.G.S. § 20-279.1(11) (2019) (emphasis added). In other words, if the operator of a motor vehicle causes an accident, the owner's liability policy must be able to provide at least $30,000 in damages to each person and at least $60,000 per accident.

The requirement of the FRA that "each automobile owner [is] to carry a minimum amount of liability insurance providing coverage for the named insured as well as any other person using the automobile with the express or implied permission of the named insured" is written into every automobile policy subject to the FRA as a matter of law. *Integon Indem. Corp. v. Universal Underwriters Ins. Co.*, 342 N.C. 166, 168, 463 S.E.2d 389, 390–91 (1995) (citing N.C.G.S. § 20-279.21(b)(2)); *Nationwide Mut. Ins. Co. v. Chantos*, 293 N.C. 431, 441, 238 S.E.2d 597, 604 (1977)). Pursuant to N.C.G.S. § 20-279.21(b)(2), general liability coverage must insure the vehicle's owner or permitted operator

> against loss from the liability imposed by law for damages arising out of the ownership, maintenance or use of such motor vehicle or motor vehicles within the [U.S.] . . . subject to limits exclusive of interest and costs, with respect to each such motor vehicle, as follows: [$30,000] because of bodily injury to or death of one person in any one accident and, *subject to said limit for one person*, [$60,000] because of bodily injury to or death of two or more persons in any

one accident, and [$25,000] because of injury to or
destruction of property of others in any one accident[.]

N.C.G.S. § 20-279.21(b)(2) (emphasis added).

¶ 38 Farm Bureau correctly contends that the "subject to said limit for one person" language in N.C.G.S. § 20-279.21(b)(2) prohibits an injured individual from recovering more than the per person limit for general liability claims. This is true because recovery of two or more individuals in any one accident is limited to "said limit for any one person" under the plain language of the statute. *See* N.C.G.S. § 20-279.21(b)(2) ($60,000 is available "because of bodily injury to or death of two or more persons[.]"). The "subject to" language of N.C.G.S. § 20-279.21(b)(2) is superfluous under any other reading of the statute.[1]

¶ 39 However, the case before us does not concern the applicable limits of Ms. Dana's general liability insurance. Rather, this case deals with her UIM policy. UIM

---

[1] When construing similarly worded statutes, other jurisdictions have held that if recovery is not limited by the per person limit, then the per accident limit would be the only limit applicable, regardless of the number of injured parties. *See Farm Bureau Mut. Ins. Co. v. Buckallew*, 246 Mich. App. 607, 618, 633 N.W.2d 473, 479 (2001) (holding that two claimants were limited to the "per person" limit because of "explicit policy language making the per occurrence limit 'subject to' the per person limit"); *American Family Mut. Ins. Co. v. Gardner*, 957 S.W. 2d 367, 369 (Mo. Ct. App. 1997) (limiting recoveries of multiple claimants to the $100,000 "per person" limit because the $300,000 per occurrence limit was "subject to" the "per person" limit); *Livingston v. Farmers Ins. Co. of Washington*, 79 Wash. App. 72, 79, 900 P.2d 575, 578 (1995) (holding that, where the $300,000 per accident UIM limit was "subject to" the per person limit, the "policies unambiguously limit[ed]" the two claimants' recovery to $100,000 per person); *Nationwide Mut. Ins. Co. v. Devlin*, 11 Cal. App. 4th 81, 86, 13 Cal. Rptr. 2d 795, 798 (1992) (limiting the two claimants' recovery to the $100,000 per person limit because the $300,000 per accident limit was "subject to" the per person limit).

coverage under N.C.G.S. § 20-279.21(b)(4) applies "when, by reason of payment of judgment or settlement, all liability bonds or insurance policies providing coverage for bodily injury caused by the ownership, maintenance, or use of the underinsured highway vehicle have been exhausted." N.C.G.S. § 20-279.21(b)(4). *See also Lunsford v. Mills*, 367 N.C. 618, 626, 766 S.E.2d 297, 303 (2014) ("Section 20-279.21 was passed to address circumstances where the tortfeasor has insurance, but his or her coverage is in an amount insufficient to compensate the injured party for his or her full damages." (cleaned up)). Here, because Mr. Bronson's exhausted general liability insurance was insufficient to fully compensate Mr. Dana and the Estate, both submitted claims under Ms. Dana's UIM policy.

¶ 40        To determine whether an injured party's UIM coverage applies under the FRA, we must consider whether (1) the tortfeasor's automobile was an "underinsured highway vehicle" and (2) the tortfeasor's liability policy was exhausted. N.C.G.S. § 20-279.21(b)(4). If UIM coverage is triggered, then the amount of coverage must be calculated by determining "the difference between the amount paid to the claimant under the exhausted liability policy or policies and the limit of underinsured motorist coverage applicable to the motor vehicle involved in the accident." *Id.*

¶ 41        An underinsured highway vehicle is "a highway vehicle with respect to the ownership, maintenance, or use of which, the sum of the limits of liability under all bodily injury liability bonds and insurance policies applicable at the time of the

accident is less than the applicable limits of underinsured motorist coverage for the vehicle involved in the accident and insured under the owner's policy." N.C.G.S. § 20-279.21(b)(4). Here, the tortfeasor's automobile qualifies as an "underinsured highway vehicle" because the sum of Mr. Bronson's limits of liability ($50,000 per person and $100,000 per accident) was less than the applicable limits of UIM coverage for Ms. Dana's vehicle ($100,000 per person and $300,000 per accident). Further, the tortfeasor's liability policy was exhausted by Integon's proposal to apportion the entire $100,000 per accident limit amongst the injured parties. Accordingly, Ms. Dana's UIM coverage applies, and we must calculate the amount available under Ms. Dana's UIM coverage. The question is whether the amount of coverage is governed by the FRA or the insurance policy.

¶ 42        "[W]hen a statute is applicable to the terms of an insurance policy, the provisions of the statute become a part of the policy as if written into it." *Bray v. N.C. Farm Bureau Mut. Ins. Co.*, 341 N.C. 678, 682, 462 S.E.2d 650 (1995). Thus, the policy is construed in accordance with its written terms unless a binding statute, regulation, or order requires a different construction. *Allstate Ins. Co. v. Shelby Mut. Ins. Co.*, 269 N.C. 341, 345, 152 S.E.2d 436, 440 (1967); *N.C. Farm Bureau Mut. Ins. Co., Inc. v. Lunsford*, 2021-NCSC-83, ¶ 37, 378 N.C. 181, 196, 861 S.E.2d 705, 716 (2021) (Barringer, J., dissenting).

¶ 43 The majority concedes the FRA does not specifically address this situation. Thus, we should follow our precedent. When the FRA language does not address a specific situation, we look to that of the policy. "Language in a policy of insurance is the determining factor in resolving coverage questions unless that language is in conflict with applicable statutory provisions governing such coverage." *Lanning v. Allstate Ins. Co.*, 332 N.C. 309, 312, 420 S.E.2d 180, 182 (1992). As the majority acknowledges, the plain language of N.C.G.S. § 20-279.21(b)(4) does not address whether the UIM per accident limit is subject to the UIM per person limit. There is, therefore, no conflict, and we must turn to the language of Ms. Dana's UIM policy to determine whether the UIM per accident limit is subject to the UIM per person limit. *See Lanning*, 332 N.C. at 312, 420 S.E.2d at 182 (stating that where the policy language does not conflict with the FRA, the "[l]anguage in a policy of insurance is the determining factor in resolving coverage questions[.]").

¶ 44 N.C.G.S. § 20-279.21(b)(4) makes multiple references to per person and per accident limits. However, the UIM subdivision does not contain the same "subject to . . . [per person] limit" language of N.C.G.S. § 20-279.21(b)(2). N.C.G.S. § 20-279.21(b)(4) provides, in relevant part, that UIM coverage is to be used "only with a policy that is written at limits that exceed those prescribed by subdivision (2) of this subsection . . . [t]he limits of such [UIM] coverage shall be equal to the highest limits of bodily injury liability coverage . . . the limits shall not exceed . . . ($1,000,000) *per*

*person* and . . . ($1,000,000) *per accident*[.]" N.C.G.S. § 20-279.21(b)(4) (emphasis added). Notably, N.C.G.S. § 20-279.21(b)(4) provides that the limit of UIM coverage is "the difference between the amount paid to the claimant under the exhausted liability policy . . . and the limit of [UIM] coverage *applicable* to the motor vehicle[.]" N.C.G.S. § 20-279.21(b)(4) (emphasis added).

¶ 45    Accordingly, because N.C.G.S. § 20-279.21(b)(4) does not address whether the UIM per accident limit is subject to the UIM per person limit, there is no conflict, and we must turn to the language of Ms. Dana's UIM policy to determine whether the UIM per accident limit is subject to the UIM per person limit. *See Lanning*, 332 N.C. at 312, 420 S.E.2d at 182 (stating that where the policy language does not conflict with the FRA, the "[l]anguage in a policy of insurance is the determining factor in resolving coverage questions[.]").

¶ 46    In interpreting the language of an insurance policy, we "must enforce the policy as written." *Nationwide Mut. Ins. Co. v. Mabe*, 342 N.C. 482, 492, 467 S.E.2d 34, 40 (1996). In addition, "[o]ur interpretation of an insurance policy is based on the fundamental principle that the plain language of the policy controls." *N.C. Farm Bureau Mut. Ins. Co., Inc. v. Martin*, 376 N.C. 280, 286, 851 S.E.2d 891, 895 (2020). "[I]f a policy is not ambiguous, then the court must enforce the policy as written and may not remake the policy under the guise of interpreting an ambiguous provision." *Mabe*, 342 N.C. at 492, 467 S.E.2d at 40. However, if the language of the policy is

ambiguous, then "the doubts will be resolved against the insurance company and in favor of the policyholder." *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978); *see also Lanning*, 332 N.C. at 316–17, 420 S.E.2d at 184 (concluding that where the FRA neither required nor prohibited intrapolicy stacking, policy language that was "clear, and capable of but one reasonable interpretation" controlled the outcome).

¶ 47        Here, the relevant portion of the UIM provision in Ms. Dana's policy provides:

> Subject to [the] limit for each person, the limit of bodily
> injury liability shown in the Declarations for each accident
> for [UIM] Coverage is our maximum limit of liability for all
> damages for bodily injury resulting from any one accident.

¶ 48        The language of the UIM policy is "clear, and capable of but one reasonable interpretation[.]" *Lanning*, 332 N.C. at 317, 420 S.E.2d at 184. The policy plainly states that the UIM per accident limit was subject to the UIM per person limit, and that the proper amount of UIM coverage available was subject to the per person limit. Thus, the amount of UIM coverage available to Mr. and Ms. Dana for their injuries was subject to the per person limit. Because the policy language is clear, and because our courts may not "rewrite the contract or impose liabilities on the parties not bargained for[,]" *Woods*, 295 N.C. at 506, 246 S.E.2d at 777, the $100,000 person limit applies, reduced by the recovery under the tortfeasor's policy. Thus, under Ms. Dana's UIM policy, William T. Dana is entitled to $68,000 and the Estate of Pamela

M. Dana is entitled to $56,250.[2]

¶ 49        The majority dismisses looking to the policy language by waiving the false flag that our analysis "would allow insurers to have a significant degree of flexibility in drafting policies as they see fit." The reality is that the insurance industry is heavily regulated in this state, insurance policies are virtually uniform, and policies must be approved by the Insurance Commission. *See* N.C.G.S. § 58-2-53 (2019) ("Whenever any provision of this Chapter requires a person to file rates, forms, classification plans, plans of operation, the Safe Driver Incentive Plan, or any other item with the Commissioner or Department for approval, the approval or disapproval of the filing is an agency decision[.]"). *See also* N.C.G.S. § 58-5-95 ("Deposits subject to approval and control of Commissioner"); N.C.G.S. § 58-7-60 ("Approval as a domestic insurer"); N.C.G.S. § 58-10-347 ("Provisional approval for a license"); N.C.G.S. § 58-35-45 ("Filing and approval of forms and service charges"); N.C.G.S. § 58-36-20 ("Disapproval; hearing order; adjustment of premium, review of filing"); N.C.G.S. § 58-40-45 ("Disapproval of rates; interim use of rates"); N.C.G.S. § 58-45-30 ("Directors to submit plan of operation to Commission; review and approval; amendments;

_____

[2] Both William T. Dana and the Estate of Pamela M. Dana are entitled to the UIM policy's per person limit of $100,000, less the amount of Integon's liability coverage ($32,000 for William T. Dana and $43,750 for the estate of Pamela M. Dana). *See* N.C.G.S. § 20-279.21 (b)(4) ("In any event, the limit of underinsured motorist coverage applicable to any claim is determined to be the difference between the amount paid to the claimant under the exhausted liability policy or policies and the limit of underinsured motorist coverage applicable to the motor vehicle involved in the accident.").

appeal from Commissioner to superior court"); N.C.G.S. § 58-47-65 ("Licensing; qualification for approval"); N.C.G.S. § 58-47-175 ("Approval of advertising"); N.C.G.S. § 58-50-85 ("Approval of independent review organizations"); N.C.G.S. § 58-50-125 ("Health care plans; formation; approval; offerings"); N.C.G.S. § 58-50-131 ("Premium rates for health benefit plans; approval authority; hearing"); N.C.G.S. § 58-51-85 ("Group or blanket accident and health insurance; approval of forms and filing of rates"); N.C.G.S. § 58-51-95 ("Approval by Commissioner of forms, classification and rates; hearing; exceptions"); N.C.G.S. § 58-52-15 ("Forms and rate manuals subject to § 58-51-1; disapproval of rates"); N.C.G.S. § 58-56-21 ("Approval of advertising"); N.C.G.S. § 58-57-30 ("Forms to be filed with Commissioner; approval or disapproval by Commissioner"); N.C.G.S. § 58-58-220 ("Approval of viatical settlement contracts and disclosure statements"); N.C.G.S. § 58-65-132 ("Review and approval of conversion plan; new corporation"); N.C.G.S. § 58-72-50 ("Approval, acknowledgment and custody of bonds"); N.C.G.S. § 58-91-50 ("Product filing and approval")

¶ 50 Because the trial court erred when it granted summary judgment to Mr. Dana and the Estate, and the Court of Appeals erred when it affirmed the trial court's decision, I concur in the result reached by the majority.

Chief Justice NEWBY and Justice BARRINGER join in this concurring opinion.